```
                                                         USDC SDNY
                                                         DOCUMENT
                                                         ELECTRONICALLY FILED
UNITED STATES DISTRICT COURT                             DOC #: _____
SOUTHERN DISTRICT OF NEW YORK                            DATE FILED: April 15, 2015
------------------------------------------------------------------ X
                                                :
UNITED STATES OF AMERICA                        :
                                                :        14 Cr. 296  (KBF)
                       -v-                      :
                                                :        OPINION & ORDER
MATTHEW DAVIS,                                  :
                              Defendant.        :
                                                :
------------------------------------------------------------------ X
```

KATHERINE B. FORREST, District Judge:

The Government has charged Matthew Davis with six separate crimes – four of which involve an alleged murder-for-hire of Terry Harrison[1]: Count Two charges conspiracy to commit a murder-for-hire, Count Three is a substantive murder-for-hire charge, Count Four charges use of a firearm in connection with the crimes charged in Counts Two and Three, and Count Five charges use of a firearm in connection with the crimes charges in Counts Two and Three where the firearm was discharged.

The matter proceeded to trial commencing on March 30, 2015. The jury was charged and began deliberations on April 9, 2015. At the close of the Government's case, the defendant timely moved pursuant to Rule 29 of the Federal Rules of Criminal Procedure for a verdict of acquittal on the murder-for-hire charges as well as those charges relying on the murder-for-hire charges. Defendant's motion was focused on one element: a promise or agreement to pay anything of pecuniary value as consideration for the murder. 18 U.S.C. § 1958(a). At that time, the Court

---

[1] Harrison was shot and killed on September 10, 2010.

expressed its preliminary view that the Rule 29 motion was a serious one, mentioning U.S. v. Frampton, 382 F.3d 213 (2d Cir. 2004) and U.S. v. Chong, 419 F.3d 1076 (9th Cir. 2005).  The Court indicated that these cases – among others – were certainly relevant to consideration of the motion.  The Court provided the parties with an opportunity to brief the issue and present the Court with their respective view on the two cases the Court mentioned as well as any others, when placed against the factual record in this case.

The Court received the parties' submissions on April 13, 2015.  (ECF Nos. 72, 73.)  Those submissions confirm the Court's view as to the seriousness of defendant's motion.  Indeed, the statute, applicable case law and record in this case leave no doubt that this Court must grant that motion.  It does so at this time.

I.   RULE 29 STANDARD

Rule 29 of the Federal Rules of Criminal Procedure provides for a motion for judgment of acquittal at the close of the evidence and prior to submission to the jury for any offense as to which the evidence is insufficient to sustain a conviction.  Fed. R. Crim. P. 29.  Defendant here made a timely motion.  The Court reserved decision on that motion pursuant to Fed. R. Crim. P. 29(b).  When a Court has reserved decision, it may decide the motion either before or after the jury has returned a verdict, or when it has been discharged without returning a verdict – that is, hung.  Fed. R. Crim. P. 29(b).  In such a case, the Court may enter a judgment of acquittal if it decides the motion in the defendant's favor, as it does here.

In this case, the jury has indicated an impasse though the Court has not yet discharged the jury.

In ruling on a Rule 29 motion, the question for the Court is a limited one:  is there record evidence to sustain a verdict of guilty?  A defendant making an insufficiency claim under Rule 29 bears a very heavy burden.  See United States v. Desena, 287 F.3d 170, 177 (2d Cir. 2002); U.S. v. Best, 219 F.3d 192, 200 (2d Cir. 2000).  The question is not whether the Court itself believes the evidence adduced at trial establishes the defendant's guilt beyond a reasonable doubt, but whether any rational trier of fact could.  See United States v. Payton, 159 F.3d 49, 56 (2d Cir. 1998).  "In other words, the Court may enter a judgment of acquittal only if the evidence that the defendant committed the crime is 'nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'"  United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999) (citation omitted); see also United States v. Hernandez, 85 F.3d 1023, 1029 (2d Cir. 1996).

Simply put, if any rational juror could find the essential elements proven beyond a reasonable doubt, then the Court must deny the motion for acquittal.  See United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000).  In a close case, where "either of two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter."  Id. (citation omitted).

Whether the evidence is sufficient or not is viewed in the light most favorable to the Government.  See United States v. Aleskerova, 300 F.3d 286, 292 (2d Cir. 2002); United States v. Reyes, 302 F.3d 48, 50 (2d Cir. 2002).  The Court may not

substitute its own credibility determinations for those of the jury. See <u>United States v. James</u>, 239 F.3d 120, 124 (2d Cir. 2000). In deciding a motion for acquittal, this Court must draw all inferences that a jury might reasonably draw in favor of the Government. See <u>United States v. Morrison</u>, 153 F.3d 34, 49 (2d Cir. 1998). That is, choosing between two inferences is the task of the jury and not the judge. See <u>United States v. McDermott</u>, 245 F.3d 133, 137 (2d Cir. 2001).

It is of course well accepted that a jury's verdict may be based entirely on circumstantial evidence. <u>See</u> <u>United States v. Martinez</u>, 54 F.3d 1040, 1043 (2d Cir. 1995); <u>United States v. Sureff</u>, 15 F.3d 225, 228 (2d Cir. 1994).

II.   THE PECUNIARY VALUE ELEMENT OF MURDER-FOR-HIRE

Title 18, section 1958 of the United States Code provides:

> Whoever travels in or causes another…to travel in interstate or foreign commerce, or uses or causes another…to use the mail or any facility in interstate commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or who conspires to do so…and death results…shall be punished by death or life imprisonment…

The only issue on this motion is as to whether the Government has adduced sufficient evidence to support what is commonly referred to as the "pecuniary value element" of the murder-for-hire crime. The Second Circuit has spoken directly to what is required to meet this element. See <u>United States v. Frampton</u>, 383 F.3d 213, 218-19 (2d Cir. 2004).

In reviewing the statute itself, the Second Circuit made clear that the federal murder-for-hire statute proscribes a "very limited category of behavior; only those

instances in which one party **agrees** to commit a murder **in exchange for** another party's provision (or future promise) of payment . . . " Id. at 217 (emphasis added). It stated further that the reach of the statute is "further limited" by the requirement that the payment take the form of anything of "pecuniary value." Id. at 218. The statute defines "anything of pecuniary value" as "anything of value in the form of money, a negotiable instrument, a commercial interest, or anything else the primary significance of which is economic advantage." 18 U.S.C. § 1958 (b)(1).

    In Frampton, the Second Circuit addressed a circumstance in which the promise of a future favor was found insufficient to meet this "pecuniary value" element. Id. at 218. There, the person who hired the shooter (equivalent here to the Government's contentions vis-à-vis Davis), testified that as consideration, the shooter would receive, "If he needed a favor from me, he'd get a favor." Id. at 218. When asked what this meant, he stated, "Anything. Anything he need." Id. The Government marshalled evidence supporting an inference that the "favor" carried economic value in the form of facilitating the operation of a crack enterprise by reducing its threat from rivals. Id. at 218-19. The Second Circuit found this insufficient. It stated, "The federal murder-for-hire statute does not speak in such colloquial terms. Moreover, the mere fact that the consideration offered by one (the solicitor) in exchange for another's (the murderer's) agreement to commit a murder *could* inure to the economic benefit of the latter is insufficient." Id. at 219 (emphasis in original). "[T]here must be some evidence to establish that at the time

the agreement was formed, the consideration was something the 'primary significance' of which lay in its 'economic advantage.'" Id. (citing the statute).

The Court left no ambiguity in its view of the legal requirement: "we hold that consideration in the form of a 'favor' is insufficient to support a conviction under § 1958, at least in the absence of evidence suggesting that either party had an understanding as to the form that **it would actually take**." Id. at 219 (emphasis added).

In U.S. v. Hardwick, the Second Circuit reiterated that "[t]he consideration requirement of Section 1958 is interpreted in 'the traditional sense of bargained for exchange.'" U.S. v. Hardwick, 523 F.3d 94, 99-100 (2d Cir. 2008) (citing United States v. Wicklund, 114 F.3d 151, 154 (10th Cir. 1997)). The Second Circuit reviewed case law in noting that "the pecuniary value requirement is satisfied, for example, by the payment or promise of sale-level quantities of drugs, insurance proceeds, or a promise to reimburse a hit man for a firearm purchase in addition to letter him keep the firearm" but that "[t]he promise of a future, unspecified favor—in absence of any evidence suggesting that either party to the agreement had an understand of what form such a favor would take—does not constitute pecuniary value under Section 1958." Id. (citations omitted).

Other circuits have similarly required clarity on the pecuniary value element. In United States v. Chong, 419 F.3d 1076, 1082 (9th Cir. 2005), the Ninth Circuit reviewed case law in other circuits, including Frampton. It stated, "We agree with our sister circuits that there must be evidence that the hitmen clearly understood

6

they would receive something of pecuniary value in exchange for performing the solicited murderous act." Id. at 1082.  It found sufficient evidence lacking in the case before it.  Id. There was evidence at the trial of a criminal enterprise which had an established pattern of paying for special assignments and that the charged murder was one of them; the shooter was promised $100 for the task.  Id. The Court found "the jury did not have sufficient evidence from which to find that the $100 constituted compensation for the murder-for-hire, given the absence of any overt agreement or understanding between the shooter and the defendant or his co-conspirators." Id.  The Court found further that it was not the amount as much as the fact that the evidence failed to support the government's claim that money was promised to the shooter in exchange for the murder. Id.

In opposition to this motion, the Government cites several cases which it asserts are supportive of the sufficiency of the evidence here.  The Court has reviewed them and disagrees.  First, none of the cases are as close to the facts before this Court as that from this very circuit, Frampton.  None of the cases cited by the Government are Second Circuit cases.  The Government cites United States v. Gibson, 530 F.3d 606, 610 (7th Cir. 2008), for the proposition that criminals may use code words which imparts their intentions; that they are unlikely to speak in crystal clear language given the base illegality of their conduct.  That is an unassailable proposition – but does not answer the question here.  When code words are used which carry unambiguous meaning, they are equivalent to the words for which they are code.  If, for example, the word "hat" was known on the street as

$1,000, then a statement "I'll give you two hats" or "half a hat" would be a clear statement of something of pecuniary value. Notably, in Gibson itself the evidence as to pecuniary value was clear – the shooter said he would do the murder for a 50% share in profits from a drug spot in exchange for the murder, and he later discussed doing it for "two stacks" or "a couple of thousand dollars." Id. at 608.  There is no argument in Gibson as to any ambiguity regarding the meaning of "two stacks."

The Government also cites a case from the Sixth Circuit, United States v. Acierno, 579 F.3d 694 (6th Cir. 2009), as a case in which "the discussion on the cost of the murder-for-hire left much to be desired." (Gov't Br. at 8, ECF No. 73.)  But in that case, the sponsor and shooter explicitly discussed several potential items of pecuniary value, including proceeds from a life insurance policy, Acierno, 579 F.3d at 699; or $1,000, id. at 700, and then finally $100 for gas money, id.  The Court found that in light the "substantial history of negotiating this murder, the jury was within the realm of reason to conclude that this $100 was payment for the murder." Id.

III.    DISCUSSION

Terry Harrison was murdered by Kevin Wilson, who testified as a cooperating witness for the Government in this trial.   According to Wilson, he was lured into a van and asked to murder an unknown victim; when he refused, a gun was put to his head and he was told that he would be killed if he did not commit the murder.  He testified that at this point it was too much for him and he agreed.  ("Q: Why did you agree" A: He told me he was going to kill me." Tr. 1303:17 – 1303:18.)

Wilson – who eventually shot and killed Harrison – concedes that he was not again threatened in the ensuing days prior to the murder.  Nevertheless, Wilson's version of the agreement into which he entered was one in which he initially agreed to commit the murder in exchange for his life – and while a life no doubt carries the highest of all values, it is different from the statutory use of the phrase "pecuniary value."  The government then asked, "Why did you eventually decide to commit that murder voluntarily?" He responded, "I thought I could have got money out of it.  I could have been part of they crew." (Tr. 1303:25 -1304:03.)

      The government later asked Wilson whether the defendant made any statements to him about what would happen after the murder.  (Tr. 1315.)  He testified about the defendant that, "He just said that he got me, don't worry about it." (Tr. 1315:03)  Wilson was later asked on direct to return to that conversation and to describe what he understood this statement to mean. He testified, "That he got me, he would hold me down. Like money or whatever I needed, I could come to him for anything." (Tr. 1326:21 – 1326:22.)  The Government sought further clarification as to whether the words "hold me down" had particular meaning.  (Tr. 1327.)  Wilson answered that it meant "come to me for whatever." (Tr. 1327:04.)  The communication regarding the promise or agreement of anything of pecuniary value never got clearer than this.  The record here is comparable to that in <u>Frampton</u> in which a statement is too vague and non-specific to support the "pecuniary value" element of the murder-for-hire charge.  There certainly is no basis for any mutual understanding.  The ambiguity of the arrangement was repeatedly

9

brought out on cross-examination. While the examination on this point is lengthy, it is critical to the determination of this motion. The cross-examination first addressed the initial conversation between Davis and Wilson in the van:

> Q. He didn't say he would give you money if you did it, did he?
> A. No.
> Q. He didn't say I'll give you jewelry or cars, did he?
> A. No.
> Q. He didn't say I'll bring you into my crew if you do this for me, did he?
> A. No.
> Q. He didn't say I'll make it worth your while, did he?
> A. No.
> Q. He didn't tell you why he chose you to do this, did he?
> A. No.
> Q. He didn't tell you what the possible plan was, did he?
> A. No.
> Q. You had never discussed with him at all in that van money at all?
> A. Right.
> Q. You didn't discuss how much, when, if you'd get any up front, any down payment, nothing?
> A. Right.

(Tr. 1468:07 – 1469:01.)

Wilson was asked about the change in plan for Wilson to be the primary shooter rather than the backup shooter:

> Q. And you still, even when the plans changed from you being the shooter to you now being the backup shooter, there was still no discussion of money, was there?
> A. Right.
> Q. You still didn't know what you would get, if anything, if you did what you were supposed to do, right?
> A. Right.
> Q. You had no idea if there would be any payment at all for you, right?
> A. I didn't know what was going to happen.
> Q. Say it again.
> A. I didn't know what was going to happen.
> Q. Is that what you said, you didn't know what was going to happen?
> A. No.

10

> Q. And not only didn't you know, but you didn't know because nobody promised you anything, did they?
> A. Right.
> Q. Nobody told you they'd give you anything, did they?
> A. Right.
> Q. You didn't ask for anything, did you?
> A. Right.
> Q. There was no discussion beforehand as to what would happen if you succeeded, right?
> A. Right.

(Tr. 1481:21 – 1482:20.)

Wilson was asked about his prior testimony that Davis told him that he would "hold him down":

> Q. You said it came about at some point, you said that Matthew said he would hold you down, you'd be good; is that right?
> A. Yeah, yeah.
> Q. So when he said that, to you, that meant that you would be accepted by them; isn't that right?
> A. Right.
> Q. It didn't necessarily mean that he was going to give you money, did it?
> A. Meant that too. That's how we talk in street code.
> Q. Well, hold you down can mean different things, can't it?
> A. Yeah, it can mean a lot of things.
> Q. It can mean what?
> A. A lot of things.
> Q. Right, exactly. Hold you down can mean watch your back, right?
> A. Right.
> Q. Hold you down can me, I'm with you, we'll be together, I'll protect you right, right?
> A. Right.
> Q. Hold you down could mean you can come join us and be in my crew, right?
> A. Right.
> Q. Hold you down can mean you get money, right?
> A. Right.
> Q. It can be any one of a different number of things and it can even be more than that, right?
> A. Right.

(Tr. 1483:22 – 1484:23.) After several questions to which the Government objected, the cross-examination continued on this point:

> Q. You were looking to hopefully get accepted by these guys, weren't you?
> A. A lot of things; that and money, you know.
> Q. Well, that's what you were hoping for, right?
> A. Right.
> Q. But not one of these guys -- not Matthew, not Luch, nobody -- ever said anything using the words "money" or a dollar amount or anything like that, did they?
> A. Right.
> Q. The only thing you heard was, hold you down, you'd be good; isn't that right?
> A. Right.
> Q. Now, when you heard Matthew or anybody else say, hold you down, you'd be good, did you say how much we talking about, guys?
> A. No.
> Q. Did you ever say, give me a sense of when I will get paid, will I get something up front, will I get something later? Anything like that?
> A. No.
> Q. There was no discussion at all about specific dollar amount, was there?
> A. No.

(Tr. 1485:24 – 1486:21.)

After the murder – but on the same day – Wilson testified that the defendant called him and stated that "it was payday" and that he should come down the block. (Tr. 1350:05.) He then went with the defendant and others to a location in Harlem in which the leader of the drug enterprise – Luchie – gave him $1,000. The Government combines the defendant's statement "[I] got you" – which occurred before the murder – with the defendant's statement "it was payday" – after the murder – to argue that a rational juror could reasonably infer that at the time the defendant solicited Wilson to commit the murder, Davis intended to pay him. Left unsaid is whether such intent was conveyed to and understood by Wilson and

12

whether it needs to be. It does. The Government's position is that Wilson's understanding is irrelevant to whether Davis can be convicted of the murder-for-hire. The Government bases its argument in this regard on the Second Circuit's statement in U.S. v. Hardwick that "[w]hen the defendant is the solicitor of the murder-for-hire, it is the defendant's intent that controls." Hardwick, 523 F.3d at 100.[2]

Hardwick, however, stands for other propositions of importance. In that case, the Second Circuit reiterated that "[t]he consideration requirement of Section 1958 is interpreted in 'the traditional sense of bargained for exchange'". Id. at 99-100. Consideration here must involve an intended quid-pro-quo of anything of pecuniary value. Id. The concept of consideration involves mutuality. See Wicklund, 114 F.3d at 154 ("This language is consistent with our reading of § 1958 as criminalizing payment made either before or after the murder, because both circumstances describe a **mutual** understanding that something of value **will be** exchanged for committing a murder") (emphasis added). In short, it is not sufficient to have one hand clapping.

The current record does not support an advance, before the murder, bargained for exchange or understanding of a quid-pro-quo involving something of pecuniary value between Davis and Wilson. It supports only that Davis would make the murder worth Wilson's while – in some unspecified way. While Davis's intent controls, the intent of the other party to the bargain cannot be irrelevant. If

---

[2] It is worth noting that in Hardwick the state of mind of the shooter was not probative of whether he was "hired" as he was in fact an undercover agent. Id. at 100.

13

it were, the "as consideration for the receipt of, or as consideration for a promise or agreement to pay" language in the statute would become irrelevant. A murder-for-hire necessarily involves mutuality. At a minimum, the solicitor must intend to provide something of pecuniary value to the murderer; and he must convey that fact to the murderer. Otherwise, the murderer has not, in any sense, been "hired" by way of a payment (tendered before or after the murder) or promise of anything of pecuniary value.

In short, there must be sufficient evidence that Davis hired Wilson to do the job – not just convinced or coerced him to do it based on a vague hope. It is similarly legally insufficient that Davis may have held a unilateral belief that the likely form of compensation was money. Even assuming that, it is not enough. Hiring in the § 1958 sense involves agreement to murder <u>for</u> a pecuniary payment or promise of payment. Here, there was no such hiring, though there was in fact a post-murder payment. As the Government concedes, the promise or agreement that anything of pecuniary value would be provided in consideration for a murder is one which must occur prior to the murder itself. See <u>Frampton</u>, 383 F.3d at 219 ("there must be some evidence to establish that **at the time the agreement was formed**, the consideration was something the 'primary significance' of which lay in its 'economic advantage.'") (citing the statute) (emphasis added).

Requiring strict adherence to the statutory language is not only required by principles of statutory construction but also by the particularly high stakes here. Murder-for-hire resulting in death carries a <u>mandatory</u> term of life without parole.

Any defendant convicted of a crime carrying such a penalty is entitled to strict construction and careful application.

The Government also urges that it need not prove that something of pecuniary value was the sole motivation for the shooter – so long as it was "a" motivation. This may be true, but it is irrelevant here as the evidence is not that Wilson knew he would be paid money and might also receive non-pecuniary additional benefits, it is that he had no idea what benefit he would receive. Money was one among a number of possibilities – with no agreement as to any particular form of benefit. No rational juror could view the evidence otherwise.

IV. CONCLUSION

For the reasons set forth above, the Court finds that no rational juror could find that sufficient record evidence exists to support the "pecuniary value" element of the crime of murder-for-hire. The defendant is therefore entitled to an acquittal on those charges which depend on that crime, including Counts Two, Three, Four and Five.

SO ORDERED.

Dated:   New York, New York
         April 15, 2015

*K B. Forrest*
KATHERINE B. FORREST
United States District Judge